## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

KENYATTA KELLY

VERSUS

BRETT STASSI, IBERVILLE
PARISH SHERIFF, *et al*

CIVIL ACTION

18-263-SDD-RLB

### RULING

This matter is before the Court on the *Motion for Summary Judgment*[1] filed by Defendants, Mark Cooper ("Agent Cooper") and Iberville Parish Sheriff Brett Stassi ("Sheriff Stassi")(collectively, "Defendants"). Plaintiff Kenyatta Kelly ("Plaintiff" or "Kelly") filed an *Opposition*[2] to the *Motion*, to which Defendants filed a *Reply*.[3] Kelly also filed a *Surreply*.[4] For the reasons that follow, the Court finds that Defendants' *Motion* shall be GRANTED in part and DENIED in part.

## I.    FACTUAL BACKGROUND

On March 10, 2017, Iberville Parish Sheriff's Office ("IPSO") Agent Mark Cooper sat down to lunch at a sushi restaurant in Plaquemine, Louisiana with several of his fellow officers.[5] One of them received a phone call from an informant, who stated that a man named Gregory Hardin ("Hardin") was, in Cooper's words, "supposedly coming from Baton Rouge with a large quantity of different narcotics."[6] The gathered officers were

---

[1] Rec. Doc. No. 27.
[2] Rec. Doc. No. 29.
[3] Rec. Doc. No. 31.
[4] Rec. Doc. No. 34.
[5] Rec. Doc. No. 27-3 (*Deposition of Mark Cooper*), p. 31, lines 16-23.
[6] *Id*. at p. 32, lines 16-19; Rec. Doc. No. 27-8, p. 4.

familiar with Hardin – he had previously attempted to flee from interactions with police.[7] They agreed to take a position on Louisiana Highway 1 South ("LA-1") and, if they encountered Hardin, to conduct a "rolling road block."[8]

After lunch, Agent Cooper got in the front passenger seat of a dark gray Dodge pickup truck driven by Sergeant Jeremy Balcuns ("Sergeant Balcuns"). Agent Tyson Mire ("Agent Mire") sat behind Cooper, in the back seat on the right passenger side.[9] Agent Michael Moore ("Agent Moore") drove a second vehicle. Not long after they set up on LA-1, the officers spotted Hardin's car and confirmed that Hardin was the driver.[10] Sergeant Balcuns pulled his pickup in front of Hardin's car, and Agent Moore drove up behind. The officers slowed down until all three vehicles arrived somewhere on the right side of the roadway. Agent Cooper recalls that they stopped "half on the shoulder, half on the road, maybe"[11] and that the back bumper of Balcuns' truck was "closer than ten feet"[12] to the front of Hardin's car. Agent Mire likewise estimated the distance at "approximately 10 to 15"[13] feet. Plaintiff, for her part, disputes that Hardin's car ever came to a complete stop.[14]

Agent Cooper and Agent Mire exited the pickup on the passenger side and began to walk toward Hardin's car.[15] Although some of the facts surrounding what happened next are disputed, it is uncontroverted that Hardin then drove his car to the right, off the

---

[7] Rec. Doc. No. 27-4 (*Deposition of Michael Moore*), p. 16, lines 14-15 ("We've dealt with him prior. And every time we dealt with him, he always takes off"); Rec. Doc. No. 30-16 (*Deposition of Tyson Mire*), p. 20 ("Several officers that were present that day had prior dealings with Hardin that advised he is known to run and they had gotten in several pursuits with him").

[8] Rec. Doc. No. 30-16, p. 22, lines 2-3.

[9] *Id*. at p. 21.

[10] Rec. Doc. No. 27-3, p. 25.

[11] *Id*. at p. 39.

[12] *Id*. at p. 43.

[13] Rec. Doc. No. 30-1, p. 26.

[14] Rec. Doc. No. 30-1, p. 2, ¶ 4.

[15] Rec. Doc. No. 27-4, p. 39; Rec. Doc. No. 30-16, p. 27.

road into a wet grassy area[16] and that, as Hardin was driving that way, Agent Cooper shot twice into the car, one of the shots hitting Hardin's passenger, Kenyatta Kelly ("Kelly"), in the right elbow.[17] Kelly filed the instant lawsuit, asserting that Agent Cooper committed a constitutional violation by using excessive force upon her, in addition to claims for state-law excessive force, negligence, and vicarious liability.[18]  Defendants now move for summary judgment, arguing that Agent Cooper's use of force was "objectively reasonable" because he "believed that Hardin was about to run him down with a car."[19] To find otherwise, Defendants argue, would be to inappropriately second-guess Agent Cooper's decision, which was made in the chaotic and tense environment on the scene.[20] Kelly's injury, while "unfortunate," was not the result of excessive force by Agent Cooper but instead was "brought about entirely by Hardin's actions,"[21] according to Defendants. Although Defendants style their *Motion* as a *Motion for Summary Judgment*, the Court notes and will discuss *infra* that it is in fact a partial motion because their motion was deficient with respect to Kelly's negligence claims.

Kelly asserts that the threat posed by Hardin's car was not sufficient to justify the use of deadly force. She disputes that Agent Cooper was directly in Hardin's path, crediting instead the statement that Cooper gave to the Louisiana State Police on the day of the shooting: that he "jumped out of the way" before firing his gun.[22] Overall, Kelly summarizes the event as follows: "Cooper knew Hardin was going around him; Cooper

---

[16] Rec. Doc. No. 27-2, p. 2, ¶ 7; Rec. Doc. No. 30-1, p. 3, ¶ 3; Rec. Doc. No. 30-19, p. 5.
[17] Rec. Doc. No. Rec. Doc. No. 30-1 p. 3, ¶ 8.
[18] *See* Rec. Doc. No. 1.
[19] Rec. Doc. No. 27-1, p. 5-6.
[20] *Id*. at p. 9.
[21] *Id*.
[22] Rec. Doc. No. 30, p. 14.

moved out of the way to [a] safe place, then fired."[23] Therefore, she contends, there was no imminent threat, and Agent Cooper's use of deadly force was not reasonable. The Court will address the parties' arguments, and the evidence, in turn.

## II.    LAW

### a.  Motion for Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[24] This determination is made "in the light most favorable to the opposing party."[25] A party moving for summary judgment "'must "demonstrate the absence of a genuine issue of material fact," but need not negate the elements of the nonmovant's case.'"[26] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[27] However, the non-moving party's burden "'is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"[28]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a

---

[23] *Id.* at p. 20.

[24] FED. R. CIV. P. 56(a).

[25] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).

[26] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).

[27] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

[28] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).

reasonable jury could return a verdict for the nonmoving party.'"[29] All reasonable factual inferences are drawn in favor of the nonmoving party.[30] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[31] "Conclusory allegations unsupported by specific facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[32] Likewise, the "fundamental rules governing summary judgment"[33] prohibit the Court from weighing evidence or making credibility determinations. "By choosing which testimony to credit and which to discard, '[a] court improperly 'weigh[s] the evidence.'"[34]

### b.  Section 1983 Claims and Qualified Immunity

To state a claim under Section 1983, a plaintiff must (1) allege a violation of rights secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.[35]  Plaintiff alleges that Defendants violated her Fourth Amendment right to be free from excessive force.  The Court turns to this claim.

---

[29] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[30] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[31] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).
[32] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[33] *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236 (5th Cir. 2015).
[34] *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016)(quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)).
[35] *See Lefall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir.1994).

1.      <u>Excessive Force under the Fourth Amendment</u>

To prevail on an excessive force claim, the Plaintiff must establish: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable."[36] The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight."[37] The Court must give "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[38] The United States Court of Appeals for the Fifth Circuit instructs that the second factor – whether the suspect posed an immediate threat to the safety of the officers – is "the most important."[39] When assessing reasonableness, the Court must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[40]

Defendants argue that they are entitled to summary judgment as a matter of law on the Fourth Amendment claim because the record reflects that they committed no constitutional violation. Again, the essential elements of Kelly's claimed constitutional violation, excessive force, are as follows: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was

---

[36] *Malbrough v. Stelly*, 814 F. App'x 798, 802–03 (5th Cir. 2020)(quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)).
[37] *Graham*, 490 U.S. at 396, 109 S.Ct. 1865.
[38] *Id*.
[39] *Malbrough v. Stelly*, 814 F. App'x 798, 803 (5th Cir. 2020).
[40] *Graham*, 490 U.S. at 396–97, 109 S.Ct. 1865.

6

clearly unreasonable."[41] As to the first element, injury, it is undisputed that Agent Cooper shot Kenyatta Kelly in the elbow.[42] Because Agent Cooper used deadly force to "seize" Kelly, the relevant Fourth Amendment questions are elements (2) and (3), which Defendants contend are not satisfied because the force employed was neither excessive nor unreasonable.

The initial burden falls on Defendants, as the movants, to identify those portions of the record which they allege demonstrate the absence of a genuine issue of material fact. But Defendants do not take the position that the facts are undisputed. In fact, they concede that "exactly where Deputy Cooper was standing when Hardin accelerated the vehicle in his direction"[43] is a disputed fact, noting that, although Cooper thinks he was standing roughly at the center of Hardin's vehicle, Kelly recalls that Cooper was more toward the driver's side.[44] Defendants aver that this fact issue should not prevent summary judgment, however, because even adopting Kelly's version of the facts, "it remains undisputed that Deputy Cooper *believed* that Hardin was about to run him down with a car."[45]

Agent Cooper's belief that Hardin posed a threat is relevant, of course, but that belief must be examined in light of the facts in the summary judgment record. The Court cannot simply accept Cooper's say-so that his belief, and therefore his use of deadly force, was "objectively reasonable."[46] The Fifth Circuit clearly instructs that "whether the suspect poses an immediate threat to the safety of the officers" is assessed by reference

---

[41] *Malbrough v. Stelly*, 814 F. App'x 798, 802–03 (5th Cir. 2020)(quoting *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)).
[42] Rec. Doc. No. 27-2, p. 2, ¶ 8; Rec. Doc. No. 30-1, p. 3.
[43] Rec. Doc. No. 27-1, p. 5-6.
[44] *Id*. at p. 6.
[45] *Id*. (emphasis added).
[46] *Id*. at p. 5.

to "the *facts* and circumstances of each particular case." The Court disagrees that the dispute regarding Agent Cooper's physical position is immaterial, because Cooper's position affects the reasonableness of his perception of a threat and the necessity of using deadly force. Indeed, the policy of the Iberville Parish Sheriff's Office reflects that the officer's position is a factor in the appropriateness of using deadly force, explaining that "[s]hooting at or from a moving vehicle is authorized only when . . .  all other reasonable means of defense has been exhausted, including moving out of the path of the vehicle. . . ."[47]

   The Court also notes that the undisputed fact that Hardin drove his vehicle off the road after officers pulled him over is not an unqualified license to use deadly force. To the contrary; the Fifth Circuit in *Lytle v. Bexar Cty., Tex.* clarified that "[a] suspect that is fleeing in a motor vehicle is not so inherently dangerous that an officer's use of deadly force is *per se* reasonable."[48] Thus, the question for this Court is whether Agent Cooper could reasonably have believed that Hardin, the driver, posed a serious threat of harm. The Fifth Circuit put a somewhat finer point on it in *Malbrough v. Stelly*, explaining that "[the officer's] location matters, but it's not relevant whether, in hindsight, he was ever in real danger. We must ask whether it would have *appeared* to a reasonable officer on the scene that [he], other officers, or bystanders were in danger."[49]

   The standard having been set, the Court turns to the evidence. There is no dashcam or bodycam evidence in this case. The facts are instead derived from depositions, police reports, drawings of the scene, and statements given by officers to the

---

[47] Rec. Doc. No. 30-2, p. 2.
[48] *Lytle v. Bexar Cty., Tex.,* 560 F.3d 404, 416 (5th Cir. 2009).
[49] *Malbrough v. Stelly*, 814 F. App'x 798, 805 (5th Cir. 2020).

Louisiana State Police, who investigated the shooting. The evidence reflects that several factors contributed to Agent Cooper's perception that Hardin posed a threat. Agent Cooper's understanding of his position during the encounter is reflected in a drawing, (Figure 1 below) that he made for LSP investigators the day of the shooting:

FIGURE 1



Agent Cooper marked himself with an "X" on the passenger side of the lead vehicle, labeled "Det. Balcuns VEH." From the X, Cooper drew a line representing his path of travel. According to the drawing, Agent Cooper stopped in front of Hardin's car, slightly to the passenger side. A second line, emanating from the front of Hardin's car, depicts the trajectory of the car as it drove past Cooper and off the roadway, as Cooper recalled it.

Deputy Michael Moore, who was the driver of the trailing police vehicle that stopped behind Hardin on the side of the road, also made a drawing (Figure 2 below) for investigators on March 10, 2017. His drawing roughly tracks Cooper's; Moore testified

---

[50] Rec. Doc. No. 30-3.

that the "X" on the left hand side represents Agent Mire, and the "X" on the right shows
Moore's recollection of the position of Agent Cooper.

FIGURE 2



51

By their drawings, Agent Cooper depicts his position roughly in front of Hardin's vehicle,
toward the passenger side, and Moore depicts Cooper to the right of the passenger side.
This vicinity makes sense, given that Cooper exited the Balcuns vehicle on the passenger
side before beginning his approach.

Agent Cooper made his drawing roughly two hours after the shooting occurred,
while sitting for an interview with Louisiana State Police Master Trooper Michael Daniel
("Trooper Daniel").[52] In that interview, Cooper stated, "I'm not exactly sure where I was at
in relation to [Hardin's] vehicle."[53] At another moment, Agent Cooper averred that he was
"at the rear of the vehicle [he] was in, the rear passenger's side. Yeah, the rear

---

[51] Rec. Doc. No. 30-6.
[52] Rec. Doc. No. 30-4, p. 2.
[53] Rec. Doc. No. 30-5, p. 13.

passenger's side."[54] Cooper stated that he continued to approach Hardin's vehicle and was "almost towards the center of his vehicle" when the following occurred:

```
towards his vehicle, so I was almost towards
the center of his vehicle, and that's when you
could see him turn the wheel, you know, like
he wanted to try and go around us, I guess, in
that grassy embankment.  And he mashed on the
pedal, started coming towards me, didn't have
anywhere to go.  I jumped out of the way and
fired off two rounds.                        55
```

Agent Cooper emphasized how quickly the events had unfolded. "[I]t seemed like it happened, you know, at an instance [sic]. I know just seeing that vehicle coming towards me and . . . I know it wasn't coming at me at, like 100 miles an hour, but that's what it felt like. . .it was the reaction of, okay, he's about to run me over with the vehicle, and that's why I fired those rounds. . ."[56] Notably, at his initial interview, Agent Cooper stated that he was near the center of Hardin's vehicle but "jumped out of the way" *before* firing two rounds.

More than three years later, on October 16, 2020, Agent Cooper was deposed in connection with this case. He testified that he was "in the center of [Hardin's] vehicle"[57] when "[h]e accelerated in my direction in attempts to run me over."[58] In contrast to his

---

[54] *Id*. at p. 5.
[55] *Id*. at p. 6.
[56] *Id*. at p. 18.
[57] Rec. Doc. No. 27-3, p. 42.
[58] Rec. Doc. No. 27-3, p. 41.

previous statement that Hardin "wanted to try and go around us,"[59] in his later interview Cooper was adamant that "no, he was not trying to go around me."[60] Though he could not offer an exact measurement of the distance between himself and Hardin's car, he testified that it was "closer than ten feet."[61] Cooper could not recall if Hardin's tires squealed or threw dirt and rocks as the car accelerated, because his "adrenaline was pumping too much" and he "couldn't hear much."[62] Ultimately, Agent Cooper testified, "it was coming straight towards me and that's why I fired."[63] Cooper denied that Hardin was trying to go around him, stating that Hardin began to turn *after* he shot into the car. "I shot, he turned, made an abrupt turn to the right, and that's when I was able to move out of the way."[64]

Eagle-eyed readers of the above may perceive a discrepancy. In his contemporaneous interview, Agent Cooper testified that he saw Hardin turn the wheel as if to go around him, then accelerate towards him, at which point Cooper jumped out of the way and fired two shots. At his deposition, Cooper instead testified that the shots came first, followed by Hardin's turn to the right. Did Cooper shoot, then jump out of the way? Or did he jump out of the way and shoot "from a place of safety,"[65] as Kelly contends? Defendants downplay the factual discrepancies as attributable to the fact that "Cooper's memory of an incredibly traumatic event where he thought he might die was better in September of 2017 than it was in October of 2020."[66] That may be so, but the Court is

---

[59] Rec. Doc. No. 30-5 p. 6
[60] Rec. Doc. No. 27-3, p. 47.
[61] *Id*. at p. 43.
[62] *Id*. at p. 42.
[63] *Id*. at p. 44.
[64] *Id*. at p. 47.
[65] Rec. Doc. No. 30-1, p. 2.
[66] Rec. Doc. No. 31, p. 4.

bound on summary judgment to construe fact issues in favor of the non-movant, not to account for the vagaries of human memory. The Court does not credit Kelly's conclusory statement that "Cooper has provided false information in his testimony."[67] Weighing and assessing the credibility of the various accounts in evidence is a task properly reserved for the jury.

When deposed in connection with this case, Agent Cooper's fellow officers largely agreed that Cooper shot before he was able to jump out of the way. Agent Mire, who exited the front vehicle on the passenger side with Agent Cooper, recalls that Cooper was "a little ways to his left"[68] as they approached Hardin's vehicle. During their approach, Mire testified, Hardin "used that vehicle as a deadly weapon and accelerated and in fear for our life, you know, coming straight at us."[69] He reiterated that "[t]he vehicle was coming straight at myself and Agent Cooper."[70] Agent Mire was able to jump out of the way, but he recalled that Agent Cooper was "still being in the direct path of the accelerating vehicle."[71] "[O]nce the shots were fired," he testified, "that's when the vehicle took a, more of a, you know, right-hand veer into the ditch . . .the abrupt turn, should I say, was not taken until after the shots was fired."[72] Had Hardin not veered right, Agent Mire believed that he "definitely would have hit myself and Agent Cooper."[73] However, Mire also testified that Hardin's vehicle never came closer than 10-15 feet away from himself and Cooper.[74] Counsel asked Agent Mire: "Are you saying you couldn't move out of the path of the

---

[67] Rec. Doc. No. 30, p. 21.
[68] Rec. Doc. No. 30-16, p. 25.
[69] *Id*. at p. 27.
[70] *Id*. at p. 28.
[71] *Id*.
[72] *Id*. at p. 28; p. 30.
[73] *Id*. at p. 29.
[74] Rec. Doc. No. 30-16, p. 57.

vehicle without shooting?" "I did," he answered. "I can't justify Agent Cooper's, his actions."[75] In the Court's view, this testimony calls into question whether Cooper's use of force was reasonable from "the perspective of a reasonable officer on the scene."[76]

Deputy Michael Moore, who had a limited view of the shooting from his position in the vehicle parked behind Hardin's, testified that Hardin "was going in the area of where Cooper was standing"[77] and that it was not necessarily a low-speed situation, stating that he does "remember hearing [Hardin's] engine, you know, him trying to escape. Like it wasn't just an easy, 'I'm going to pull right here.' It was like, 'Hey, I'm getting the hell out of here.'"[78] Moore confirmed that he heard the two shots and *then* saw Agent Cooper "frogging" – which he defined as "trying to get out of the danger area"[79] – or jumping out of the way.[80] Asked whether Cooper could have gotten to safety without firing a shot, Moore testified, "I couldn't say because I – you know, I wasn't in Cooper's position."[81] Then, asked if Cooper's discharge of his firearm was "necessary or not," Deputy Moore stated, "I would say just from what I saw and heard, everything like that, I mean, I did see the car going towards Cooper."[82] Notably, in the police report that Moore drafted after the shooting, he described the events as follows:

---

[75] *Id*. at p. 56.
[76] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021).
[77] Rec. Doc. No. 27-4, p. 23
[78] *Id*. at p. 24.
[79] *Id*. at p. 46.
[80] *Id*. at p. 28.
[81] *Id*. at p. 28.
[82] *Id*. at p. 29.

HARDIN'S VEHICLE CAME TO A COMPLETE STOP AGENT MARK COOPER AND AGENT TYSON MIRE EXITED
DET. BALCUN'S UNIT. AGENTS THEN BEGAN APPROACHING HARDIN'S VEHICLE WHILE GIVING SEVERAL
LOUD VERBAL COMMANDS TO SHOW HIS HANDS AND STOP THE VEHICLE. HARDIN THEN ACCELERATED
ATTEMPTING TO STRIKE BOTH AGENTS APPROACHING THE VEHICLE. AGENT COOPER DOVE OUT OF THE
WAY OF THE APPROACHING VEHICLE STAYING ON HIS FEET DISCHARGING 2 ROUNDS INTO THE VEHICLE
TO STOP THE THREAT FROM CAUSING SERIOUS BODILY HARM OR DEATH TO HIMSELF AND OTHERS.
ONCE AGT. COOPER DISCHARGED HIS DUTY WEAPON HARDIN'S VEHICLE THEN PROCEEDED INTO THE
DITCH AND CAME TO A STOP ENDING THE POTENTIAL THREAT.

So, in his contemporaneous account, Deputy Moore wrote that Agent Cooper "dove out of the way" before – or possibly simultaneous with -- shooting into the vehicle.

LSP Trooper Daniel, who was assigned to investigate the shooting, was also deposed. At his deposition, Trooper Daniel offered various – seemingly conflicting – observations about the scene. He testified that Agent Cooper "was probably somewhere near the rear bumper of the unit he was in, kind of in between that and front of Hardin's vehicle when it accelerated. Exactly where he was, only he will be able to testify to, because there's no physical evidence, other than the shell casings where they ended up."[83] Although Trooper Daniel declined to opine on Cooper's "exact location," because of the likelihood that the shell casings could have moved around or been inadvertently kicked, he stated that, based on his observation of the shell casings and the tire marks in the grass, he "would say [Cooper] would be more close to the driver's side track"[84] when he shot. At another point, Trooper Daniel stated that "We all know [Cooper] got out on that side [the passenger side] and he approached that side."[85] Trooper Daniel recalled that "at one point, [Cooper] was positioned in front of the Hardin vehicle, but I don't remember anybody saying that he was positioned directly behind [the Balcuns vehicle]."[86] The uncertainty regarding Agent Cooper's position was ultimately not a critical point,

---

[83] Rec. Doc. No. 30-15, p. 18.
[84] *Id*. at p. 19.
[85] *Id*. at p. 25.
[86] *Id*. at p. 21.

Trooper Daniel testified, because Cooper "perceived what he perceived."[87]

The "Vehicle Diagram Sheet" (Figure 3 below) completed by LSP technicians a few days after the incident also contributes to uncertainty regarding Cooper's position. The diagonal line in the below image represents the likely trajectory of Cooper's first shot, which the report notes "entered the windshield on the driver side."[88]

FIGURE 3



The report notes that the second shot "possibly entered the driver's window," and the driver's window was "busted out."[89] LSP's diagram indicates that the shots came from the driver's side of the car, which arguably supports Kelly's contention that Agent Cooper would have been out of the path of the car as it drove to the right off the roadway. Of course, the trajectory of the shots could also indicate that Hardin had already driven slightly to the right when Cooper shot, such that Cooper was "dead center" on the car, as he testifies, before the car moved. This disputed factual issue cannot be resolved by the Court.

On October 28, 2021, Plaintiff Kenyatta Kelly executed a *Sworn Declaration* regarding the events of March 10, 2017. In contrast with the version of events offered by

---

[87] *Id*. at p. 28.
[88] Rec. Doc. No. 30-7, p. 11.
[89] *Id*. at p. 6.

IPSO officers, Kelly attests that Hardin's car "never came to complete stop [sic] on the roadway or shoulder"[90] and that "Hardin did not drive toward any officer"[91] – in fact, she states, she "did not see any deputy appear to jump away from the front of the Hardin vehicle."[92] Per Kelly, Agent Cooper was not the only shooter – she "believes Deputy Balcuns also fired at least one shot."[93] At no time, she states, did the officers identify themselves as police or "provide a warning he would shoot if Hardin did not stop his vehicle."[94]

Several aspects of Kelly's testimony – most notably her assertion that Hardin never drove toward any officers – contradict other competent summary judgment evidence in this case. The fact that her *Declaration* was sworn three and a half years after the shooting, and the fact that it presents such a starkly different version of facts, is notable. However, the Court is prohibited from making credibility determinations or weighing evidence on a motion for summary judgment,[95] and the Fifth Circuit has clearly stated that "an affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving."[96] Therefore, the Court concludes that Kelly's *Declaration* is competent summary judgment evidence and renders even more uncertain the disputed factual issue in this case: namely, Agent Cooper's position at the time of the shooting, and whether that position placed him directly in the path of Hardin's vehicle with no chance to move out of the way.

---

[90] *Id*.
[91] *Id*.
[92] *Id*.
[93] *Id*. at p. 4.
[94] *Id*. at p. 5.
[95] *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016)(quoting *Tolan v. Cotton*, 572 U.S. 650, 657 (2014)).
[96] *C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford,* 453 F. App'x 439, 443 (5th Cir. 2011).

Defendants attempt to side-step the dispute about Agent Cooper's position by arguing that Gregory Hardin pled guilty to Aggravated Assault[97] after this incident, "so he has judicially admitted that he did it."[98] This is unavailing. The fact issue that Kelly emphasizes is exactly where the officers were at the time, because in her view, if they were positioned such that they could easily move out of the way of the car without using deadly force, that was the reasonable course of action. Hardin's guilty plea does not shed light on this dispute. "Assault" is set forth in Louisiana law as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery."[99] Even assuming that Hardin has judicially admitted placing Agent Cooper in reasonable apprehension of receiving a battery, that admission does not resolve the question of how much force was reasonable under the circumstances.

Kelly cites a bevy of extra-Fifth Circuit precedent for the proposition that the officers can be liable for their use of deadly force if they provoke the confrontation.[100] But, as Defendants point out, the law in this circuit is quite clearly to the contrary. Defendants cite the recent ruling by another section of this Court in *Spears v. Gautreaux:*

> Plaintiffs seem to suggest that the Deputies created or exacerbated the situation leading to the use of force. As the Fifth Circuit in a recent opinion, *Malbrough v. Stelly*, explained, "[i]n the Fifth Circuit, the excessive force inquiry zeros in on whether officers or others were "in danger *at the moment of the threat* that resulted in the officer's use of deadly force." As such, the Fifth Circuit has rejected the idea that a police officer uses excessive force simply because he has "manufactured the circumstances that gave rise to the fatal shooting." Therefore, the proper inquiry for the Court in examining whether there are genuine disputes of material facts regarding whether the use of force was excessive and unreasonable is on the moments that the

---

[97] Rec. Doc. No. 27-5, p. 1.
[98] Rec. Doc. No. 27-1, p. 6.
[99] La. R.S. 14:36.
[100] Plaintiff cites, *inter alia*, *Billington v. Smith*, 292 F.3d 1177,1189 (9th Cir. 2002); *Abraham v. Raso*, 183 F.3d 279 (3d Cir. 1999); *Morgan v. Kirkwood*, 707 F.3d 1276, 1280-83 (11th Cir. 2013).

officers used force, not the situation leading up to the use of force.[101]

Thus, Kelly's "state-created danger" theory fails. The Court likewise declines Kelly's invitation to simply *disregard* Defendants' evidence insofar as it is allegedly "implausible and inconsistent" and "comes from interested sources."[102]  To the extent that Defendants' testimony raises credibility issues, those issues are squarely the province of the jury. Besides, Kelly risks hoisting herself by her own petard with this argument, since her own *Declaration* could also be described as inconsistent with other evidence and as coming from an interested source.

Another disputed issue is whether or not Agent Cooper knew that Kelly's child was in the backseat of the car when he shot. The presence of the child does not affect the inquiry into whether the suspect posed an immediate threat to the safety of the officers, but, in the Court's view, Cooper's knowledge or lack thereof affects the overall reasonableness under the circumstances. Agent Tyson Mire, who was seated behind Agent Cooper in the truck when the officers pulled over the Hardin vehicle, testified that he "did tell the guys . . . there was a front seat passenger and I think I did also advise them that there was a kid unrestrained in the back seat."[103] Cooper, for his part, denies that he saw anyone else in the vehicle, and testified that he could not recall whether anyone else made a statement to that effect.[104] He only realized that there was a child in the backseat "[w]hen [he] walked down to the vehicle that was in the ditch."[105]

---

[101] *Spears v. Gautreaux*, No. CV 17-105-JWD-EWD, 2020 WL 3271993, at *16 (M.D. La. June 17, 2020)(internal citations omitted), *aff'd sub nom. Jackson v. Gautreaux*, 3 F.4th 182 (5th Cir. 2021).
[102] Rec. Doc. No. 30, p. 13.
[103] Rec. Doc. No. 30-16, p. 22.
[104] Rec. Doc. No. 27-3, p. 35.
[105] *Id*. at p. 89.

What is clear, taking the record as a whole, is that the interaction between Cooper and Hardin unfolded very quickly, and the events were a "blur"[106] even to Cooper himself. The factual inquiry is complicated by the lack of body cam or dash cam footage, which could shed significant light on many of the disputed issues herein. As the Fifth Circuit instructs, "[t]he reasonableness inquiry is inherently factbound."[107] In *Harmon*, the Fifth Circuit stated that the bodycam video was "critical"[108] to their analysis. This Court has no such evidence before it.

Defendants' *Motion for Summary Judgment* will be denied as to the § 1983 claim against Agent Cooper, not because the Court wishes to second-guess Agent Cooper's decision-making or to downplay the danger faced by police in the performance of their jobs, but because the underlying facts that contribute to the excessive force analysis are disputed based on the competent summary judgment evidence before the Court – especially when the relevant factual inferences are construed in favor of Kelly as the non-movant. Specifically, the Court finds that the summary judgment evidence demonstrates disputed fact issues regarding where Agent Cooper was standing when he shot, the speed and trajectory of Hardin's vehicle, and the sequence of events, namely, whether Agent Cooper shot and then jumped out of the way or vice versa. Viewing these disputes in a light most favorable to the Plaintiff, the Court concludes that a reasonable jury could find that Agent Cooper was not directly in the path of Hardin's vehicle and that Hardin's vehicle posed no immediate threat to him. As Justice Ruth Bader Ginsberg wrote in a similar context, "[I]f an excessive force claim turns on which of two conflicting stories best

---

[106] Rec. Doc. No. 30-5 p. 19.
[107] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1164 (5th Cir. 2021).
[108] *Id*.

captures what happened on the street," precedent "will not permit summary judgment in favor of the defendant official . . . a trial must be had."[109] Accordingly, Defendants' *Motion for Summary Judgment* shall be denied as to Plaintiff's Section 1983 excessive force claim.

2.    Qualified Immunity

Defendants raise the defense of qualified immunity. Qualified immunity shields government officials from liability in their performance of discretionary functions unless their conduct violated a clearly established constitutional right.[110] "Once raised, a plaintiff has the burden to rebut the qualified immunity defense...We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."[111]

The qualified immunity defense presents a two-part inquiry: "(1) whether the facts alleged or shown by the plaintiff made out a violation of a constitutional right, and (2) whether that right was 'clearly established' at the time of the defendant's alleged misconduct."[112]   A court may address either part of the two-part inquiry first.[113]   "This inquiry focuses not on the general standard—when may an officer use deadly force against a suspect?—but on *the specific circumstances of the incident*—could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force?"[114] Qualified immunity will protect "all but the plainly incompetent or those who knowingly violate the law."[115]

---

[109] *Saucier v. Katz*, 533 U.S. 194, 216 (2001)(Ginsburg, R., concurring).
[110] *See Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th Cir. 2009).
[111] *Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005).
[112] *Ontiveros*, 564 F.3d at 382.
[113] *See Pearson v. Callahan*, 555 U.S. 223 (2009).
[114] *Ontiveros*, 564 F.3d at 383 n.1 (emphasis added).
[115] *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

21

Assessing the first prong of the inquiry – whether Plaintiff has made out a violation of a constitutional right – is thwarted by the disputed fact issues in this case. Likewise, disputed factual issues impede the inquiry into whether the right was clearly established at the time, because the Court cannot endeavor to find an on-point case or even a closely analogous one when there are multiple factual narratives in play. To be sure, there are recent Fifth Circuit cases establishing that deadly force is not excessive "when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others."[116] But the facts surrounding the threat posed by Hardin's car are in dispute, and, as the Fifth Circuit has noted, "the reasonableness inquiry is inherently factbound."[117] *Cole v. Carson* is a useful comparator here. In *Cole*, the Fifth Circuit affirmed the district court's denial of summary judgment on an excessive force claim, finding that "genuine disputes of fact regarding  . . .entitlement to qualified immunity remain."[118] The case revolved around the shooting by police officers of Ryan Cole, a seventeen-year-old who was reportedly walking around a Texas neighborhood with a handgun. The court explained that,

> What [the officers] knew before shooting at Ryan, whether they warned him before doing so, and what actions Ryan took before being shot are all disputed. The district court must afford [the officers] qualified immunity at the earliest point the defense's applicability is determinable. Here, we have not yet reached that point. It will be for a jury to resolve what happened on October 25, 2010. The district court did not err in denying the officers qualified immunity at the summary judgment stage.[119]

---

[116] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021).
[117] *Id*. at 1164.
[118] *Cole v. Carson*, 935 F.3d 444, 457 (5th Cir. 2019), *as revised* (Aug. 21, 2019).
[119] *Id*.

As in *Cole*, the existence of competing factual narratives in this case means that "the full reach of qualified immunity gives way to a trial, the first point at which its application is determinable."[120]

### 3.    Official Capacity Claim against Sheriff Stassi

Kelly's *Complaint* asserts the following Section 1983 claim against Iberville Parish Sheriff Brett Stassi: "Defendant Sheriff violated Plaintiff's right to be free from use of excessive force by failing to properly train, post appropriate written procedures and discipline deputies regarding the use of deadly force against moving vehicles containing innocent persons. The Sheriff has provided no guidance to his deputies regarding the use of deadly force against a moving vehicle containing passengers."[121] It is well-established that "[a] governmental entity . . . may only be held liable in a § 1983 suit when the complained-of constitutional injury, here the use of excessive force, results from "execution of a government's policy or custom."[122]

In their *Motion for Summary Judgment*, Defendants argue that the official capacity claim against Sheriff Stassi should be dismissed because Plaintiff points to no inadequate policy that was the "moving force" behind the alleged constitutional violation. In fact, Defendants note, the department policy cited by Plaintiff specifically addresses the situation of shooting at a moving vehicle and authorizes it only under very limited circumstances.[123] Even Plaintiff avers that Agent Cooper's actions were undertaken "in violation of his employer's policy regarding the use of deadly force against a moving

---

[120] *Id*. at 446.
[121] Rec. Doc. No. 1, p. 5.
[122] *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1168 (5th Cir. 2021)(quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)).
[123] Rec. Doc. No. 27-1, p. 13.

vehicle."[124] Even if the policy were constitutionally deficient, Defendants argue, there has been no showing of deliberate indifference by Sheriff Stassi as required by the doctrine. Plaintiff does not address these arguments in her *Opposition*, nor in her *Surreply*, even after Defendants pointed out her lack of opposition in their *Reply*. Accordingly, the Court concludes that Plaintiff's failure to oppose Defendants' motion with respect to the official capacity claims against Sheriff Stassi renders them abandoned. Moreover, the Court finds that Defendants' argument on this point has significant merit. Therefore, the official capacity § 1983 claims against Sheriff Stassi shall be dismissed with prejudice.

4.    State Law Claims

Kelly's *Complaint* raises various state law claims against Defendants, specifically negligence and a claim for excessive force under Article One, Section 5 of the Louisiana Constitution and, as to Sheriff Stassi, a claim for vicarious liability under Louisiana Civil Code Article 2320.[125] Defendants' *Motion* clearly seeks summary judgment on the Louisiana constitutional claim, but does not address negligence or vicarious liability. Kelly's *Opposition* notes that, in her view, "Defendants also seek dismissal of parallel Louisiana state claims of excessive force but not those for fault or negligence."[126] Defendants disagree, explaining that "they *are* seeking dismissal of Plaintiff's negligence claims for exactly the reasons argued in their motion."[127] Their *Memorandum in Support* does state that they move "on all claims made,"[128] but they do not go on to reference negligence, Louisiana Civil Code article 2315, or any of the elements of that claim. Based

---

[124] Rec. Doc. No. 30, p. 15.
[125] Rec. Doc. No. 1, p. 6-7.
[126] Rec. Doc. No. 30, p. 15.
[127] Rec. Doc. No. 31, p. 8 (emphasis original).
[128] Rec. Doc. No. 27-1, p. 3.

on the Court's review of Defendants' *Motion*, it is clear that they did not move for summary judgment on the state law negligence or vicarious liability claims. This oversight cannot be rectified by argument in subsequent briefs; Defendants' argument that negligence and excessive force are subject to an "overlapping standard"[129] and should therefore be considered together is not persuasive. Negligence is a distinct claim, and, while it does entail analysis of objective reasonableness, it cannot be said to "mirror" federal constitutional law, which is what Defendants argue in their brief related to Plaintiff's state law claims. Accordingly, the negligence and vicarious liability claims against Defendants are not before the Court and survive summary judgment.  In the alternative, if Defendants *had* adequately moved for summary judgment on these claims, the Court finds that, applying the "reasonableness" standard, the motion would have been denied in light of the disputed fact issues discussed above.

As to the state law excessive force claim, it is well-established that "[e]xcessive force claims under Louisiana law are analyzed with the same standard that is used to gauge excessive force claims under Section 1983.[130] That is, as in the qualified immunity context, the actions of the Defendants, when considered under state law, must be judged for objective reasonableness."[131]  As to Sheriff Stassi, the Court notes that, "[u]nder Louisiana law, the torts of assault and battery, when raised against a law enforcement

---

[129] Rec. Doc. No. 31, p. 8.

[130] *Adams v. Glaser*, 138 F.Supp.3d 727, 741 (E.D. La. 2015)(citing *Kyle v. City of New Orleans*, 353 So.2d 969, 972–73 (La. 1977) ("The use of force by law enforcement must be tested by the 'reasonable force' standard."); *Deville*, 567 F.3d at 172–73 ("Louisiana's excessive force tort mirrors its federal constitutional counterpart. 'The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result.'"); *Winston v. City of Shreveport*, 390 Fed. Appx. 379, 385–86 (5th Cir. 2010) ("Under Louisiana law, we apply the same 'reasonableness' standard to Winston's state law claims of false arrest and excessive force that we apply when analyzing whether qualified immunity shield Officer Willis against Winston's federal constitutional claims.")).

[131] *Id.*

officer acting in the course of employment, require a showing that the law enforcement officer acted with unreasonable or excessive force."[132] In the recent case *Harris on Behalf of DCJH v. Travis*, another section of this Court concluded that, where there was no indication that the Sheriff defendant therein used any force during the alleged encounter, the Sheriff "cannot be liable for using excessive force."[133] Here, as in *Harris*, in the absence of a showing that the Sheriff "had any contact with Plaintiff,"[134] the state law excessive force claim fails. As to Deputy Cooper, however, the disputed factual issues discussed *supra* with respect to the §1983 claim for excessive force prevent summary judgment on the state-law excessive force counterpart. Accordingly, summary judgment is granted as to the state-law excessive force claim against Sheriff Stassi but denied as to Cooper.

Defendants also aver that the *Complaint*, while unclear, appears to allege a failure to train and supervise claim under state law against Sheriff Stassi. Such a claim must be dismissed, they argue, because state law affords the Sheriff immunity for such discretionary functions pursuant to Louisiana Revised Statute §9:2798.1. Kelly does not oppose this argument in her *Opposition* or *Surreply*. While the Court is inclined to credit this argument as both meritorious and unopposed, it is ultimately of no moment, because, in the Court's view, no such state law failure to train and supervise claim is properly alleged against Sheriff Stassi. Kelly alleges that "the City failed to properly train UNKNOWN DEPUTY and DEPUTY MARK COOPER in the law concerning intervention,

---

[132] *Harris on Behalf of DCJH v. Travis*, No. CV 20-680-JWD-RLB, 2021 WL 4025803, at *21 (M.D. La. July 12, 2021).
[133] *Id*.
[134] *Id*.

use of deadly force on a moving vehicle, and the proper firearm training."[135] "The City" is inexplicably vague and does not suffice to identify Sheriff Stassi in this context. Accordingly, to the extent Kelly pled a state law failure to train and supervise claim against the Sheriff, that claim is dismissed with prejudice.

## III.    CONCLUSION

For the reasons stated above, Defendants' *Motion for Summary Judgment*[136] is hereby DENIED in part and GRANTED in part. Kelly's official capacity claim against Sheriff Stassi under Section 1983 is dismissed with prejudice, as is her state law excessive force claim against the Sheriff. Surviving summary judgment are the Section 1983 and state law claims for excessive force against Agent Cooper, and the negligence claims against Defendants, including the vicarious liability claim against Sheriff Stassi.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>February 25, 2022</u>.



**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[135] Rec. Doc. No. 1, p. 6.
[136] Rec. Doc. No. 27.